Case No. 174316, Noelle Hanrahan et al. v. Gary Mohr et al. Oral argument not to exceed 15 minutes per side. Mr. Vasfari for the appellate. You may approach the podium and proceed with your argument, counsel. Thank you, Your Honor. May it please the Court, my name is Raymond Vasfari and I represent the appellants, five inmates and four journalists in the caption matter. At this time I would like to reserve three minutes of my time for rebuttal. All right. There's a lot of complexity in this case and that complexity can be thought of as arriving from a number of cross-cutting cleavages. But at stake here are essentially two policies as they apply to two groups of plaintiffs, one of those groups being bifurcated between high security inmates and ordinary security or general population inmates. And how those policies applied before they were modified, which is to say the policies that were under consideration when the district court granted partial summary judgment in favor of the defendants. And then the policies after they were then twice modified between summary judgment and final judgment during the course of the litigation when the remaining claims of one of the inmates and all of the journalists were dismissed as moot. Now our contention today is that the district court erred twice. First, to the extent that it found the policies, one, content-based with respect to one group of inmates, but didn't see that as an impediment to sustaining their application as to another group of inmates and thereafter dismissing the claims of those inmates. And our argument on that, and we'll elaborate in a minute, is pretty simple. It's one group of policies. They were adopted as a unity. They were advanced along the same bases. They were defended in the same reasons or for the same reasons. And in each case, unusually, they were defended in part based upon the content-based animus underlying them. The second error in the district court was that the district judge then, with respect to the high security inmates, dismissed their claims on summary judgment, which reflects the consideration that no reasonable finder of fact could have considered that those policies violated the remaining three standards or the remaining three prongs beside content neutrality that are articulated in Thornburg v. Abbott and Turner v. Safely, namely that the policies admit of adequate alternative channels of communication are efficacious and that they actually rationally serve a legitimate penal interest and are not serving that interest in a way that could be more easily served by an easily implemented or readily available alternative. So those are all the mistakes that we see at the summary judgment level. Those policies changed during the course of litigation. And we're going to argue that they did not change enough to justify the dismissal of the remaining claims. Just to be clear on what's on appeal here, you're appealing the summary judgment of the restrictions on the restricted prison population inmates and their ability to access the media. Yes, sir. And then you're appealing the issue of whether the judge's rulings below as to what the district court said was a content neutral policy for granting interviews, whether that makes the issue moot of the media's ability or your client's ability, I should say, to access the media. You don't think that that issue is moot. That's another issue you have here on appeal. Correct. Are those the only issues that you're raising and addressing in connection with your appeal? Yes, sir. Those are the only issues that we actually raised in the appeal. We have six assignments of error. Four go to the summary judgment mistake, as we characterize it, and two to the error with respect to mootness. With respect to the summary judgment... I'm having a little trouble conceptualizing, fitting this case and sort of the more general law with respect to what penal officials can and cannot do. And it strikes me that this is not speaking with regard to any case law. This is just speaking theoretically based on general knowledge. It seems like there ought to be authority given to prison officials to limit the means of communication, I mean, for example, if you could give an interview in writing, that might be okay, but prohibiting the in-person interview might not be okay. There are, I think, three responses to that. Of course, the power to circumscribe inmate speech and media access does exist, but it's a circumscribed power. And the four limits articulated, I think, in Thornburg v. Abbott is the latter of the two, not Turner. But they're the same. It has to be content neutral. And the others that we just articulated, it has to be efficacious and alternative. So as to the bit about content, in this case, as a practical matter, the defendants justified the restrictions that they imposed on the particular group of inmate plaintiffs who were participants convicted of offenses in connection with the Lucasville riot 22 times in their complaint and for three pages in their summary judgment motion as justified by the impact that those would have on outside people. There's a whole other issue here as far as articulating justifications and consistency of the justification articulated. I'm really talking kind of in a more mega sense. Does that make any sense at all? It does. And the second answer that I would give is, and the Supreme Court, I think, in Turner said as much, sometimes the identity of the people who have been selected for being beyond the pale of interviewing can be used as a proxy for content. And that's why we have to inquire into the fit between the malady that the state says exists and the medicine that they have prescribed. And that's where we find the state. If we take the content aside, and we believe that the content-based argument is very simple, Judge Sarkis concluded that there was a content animus in these policies, and Turner says that the policies must be adopted in a content-neutral fashion. The must, which echoes the must in Ward v. Rock against racism and Clark v. Community for Creative Nonviolence, is an imperative. Unlike the other three check marks in Turner, you've got to have that one. The others you can balance, some more, some less. But the sine qua non of a legitimate policy is that it is content-neutral. And so when the finding is that the policy isn't adopted for content-neutral purposes, that should end the inquiry. That shouldn't allow him to say, but okay, it can apply to this group. Because to apply to this group is to say, well, safety considerations overcome content. But they don't. The safety considerations are down in prongs two, three, and four. Content is up there as a box that's got to be checked before you go down the list. The rest is contingent on content. And a content-based motivation is fatal. And that's where it should have stopped with respect to sustaining them. There should have been no summary judgment. At best, there should have been an inquiry into the efficaciousness and the availability of alternatives with respect to the policies. Now let's take content out for a second. Because if we take content out, what you find is the policies don't, by any stretch of the imagination, satisfy the remaining three prongs. The big wheel theory is what is being articulated here. If an inmate is interviewed, somehow that confers celebrity on the inmate, and celebrity creates leadership, and leadership in the hands of somebody who articulates the wrong message can lead to violence. That all sounds great superficially. But if you look at the mechanism by which this supposedly happens, nowhere in the record is it supported. It's true that it was found as a matter of fact on the record in Saxby v. Washington Post and in Pell v. Precunier. Those cases were decided by the Supreme Court in 1973, which by my math means the records were probably developed in the mid to late 1960s. What happened in two separate prison systems more than 50 years ago hardly carries the substantial burden of showing that this system today requires these sort of strictures. And there are all sorts of things in the record that indicate that the connection is too attenuated. Remember that what we're doing here, this is where I think we quote Butler v. Yates somewhere in our brief for the proposition of burning the house to roast the pig, is to prevent these disruptive messages from getting back inside prison walls. What these defendants are doing is preventing them from ever being articulated out into the public square to begin with. We're not talking about inmate to inmate communication. We're talking about inmate to world beyond the prison walls, which is Martinez v. Precunier. The Supreme Court held implicates a very different and less security sensitive set of concerns than does intra-prison communication. So under their theory, I interview an inmate. I broadcast that interview. It goes out into the world at large. Somebody records it. It somehow finds its way back within the prison where if an incendiary message has been articulated and if by virtue of having given the interview on camera as opposed to through a telephone interview, in writing, in a letter, or in any other form of communication, if that inmate is found persuasive, unrest might ensue. But they show not a single example of such unrest in their system, in its history, having happened that way, or in any other prison system. Are you proposing policies and procedures to be implemented by the prison for governing interviews and access to the media by a restricted prison population, or is it to the contrary the case that you want the prison to show that unfettered access or more open access would constitute danger or would jeopardize the welfare and safety of the inmates and the guards and the prison itself? What approach are you following here? Very directly. I think we need to bear in mind that there are only two sorts of restrictions here. These inmates can talk to radio reporters via telephone. I see my time is almost up. I may have leave to finish this answer. Your time is not up yet. Six seconds. In any event, no, what we're focusing on is that there are two specific restrictions. Now may I finish? Certainly. The one is that there may not be face-to-face contact with this particular group of prisoners. The second is that there may not be video recordings or audio recordings made in person of these prisoners. So there's no prohibition on that happening over the telephone. Those are the justifications that the Supreme Court says the state needs to justify in the four ways articulated in Thornburg. Those particular justifications have to add something extra to the security dimension. But they haven't shown that those move the ball forward at all. And as a matter of fact, as we point out in both our briefs, much of what they do vis-à-vis their regulations demonstrates quite the opposite, that they leave many doors open to the same sort of mischief, which under inclusiveness suggests that this is, in fact, a proxy for content, and all began as an effort to do what they say in their brief, frankly, they've always wanted to do, to prohibit people from hearing the message of those Lucasville convicts. And for those two reasons, we believe that the Court should be reversed and the matter remanded for trial. I know your time's up, but you didn't talk much about the mootness issue. The language of the policy whereby the director has discretion to grant an interview request, do you have a problem with the wording of that policy? Yes. Beyond which, perhaps you want to stand on what's in your brief. Let me just elaborate on the brief for one second, if I may. That is plenary power, and at the beginning, before the policies were changed, and in light of mootness, we want to know that the policies have been changed 13 times since they were implemented, twice between summary judgment and final judgment dismissal, twice in the last six months of the case, which indicates a litigation-based motive rather than a sincere and genuine motive for the policy change. The policies were changed to remove two things, consideration of victim impact and an inquiry by the state into the nature of the interview. But what remains is the deny for any reason whatsoever, which is a First Amendment matter, is plenary power. If the problem complained about, as it was complained in paragraph 62 of the complaint, is that there is unfettered discretion. And if the remedy asked for is to both eliminate unfettered discretion and to require the state as a way of cabining their discretion to identify and articulate the bases for which an interview is denied and permit judicial review, which we didn't get, so it wasn't moot. Having plenary power is basically reserving the ace in the hold. They give away some of their high cards, but they keep their ace. And on the record in this case, where they admit that based on content for 20 years, they systematically denied interviews to people convicted in connection with the Lucasville riot, where they rescind those policies a week and a half or two weeks before pre-trial filings are due. Having prior to that changed them after summary judgment, showing the writing on the wall. And when that's done by the fiat of a single administrative official who with the stroke of a pen can change his mind, then in A. Philip Randolph Institute, which remains good law, notwithstanding the portion of it that was overturned seven weeks ago by the Supreme Court, remains good law with respect to voluntary cessation. They have not carried the very heavy burden of demonstrating that there is no chance that this conduct is going to be repeated. And because the plenary bit still is there, they haven't even eliminated the problem. Only two-thirds of it. And so we submit the case should be remanded for trial. Thank you very much. Good morning. Good morning, Your Honors. May it please the Court. My name is Mindy Worley. I'm here representing appellees Joe Ellen Smith and Gary Moore. Mr. Vesfari has told you that content neutrality is a sine qua non to constitutionality under the First Amendment. That's not what the case law says. Now, he may be correct if he's looking at freeway billboards or yard signs for campaigns or even a demonstration across from the courthouse. But content neutrality is not the touchstone when it comes to inside a prison. Yet Mr. Vesfari insisted on talking about Thornburg and Pell and Martinez and Pecuniar and Thornburg. What prison within the prison setting cases should we be looking at? I think Thornburg and Turner. Those are the touchstones. And in both Thornburg and in Turner, content-based speech restrictions are neutral. So long as the distinctions are drawn solely on the basis of their implications for prison security. And that's what Judge Sargas found in this case. In this case, Judge Sargas held that where restrictions are applied uniformly as system-wide rules and prisoners retain sufficient alternative channels of communication, prisons can permissibly restrict interviews with restricted population inmates. Now, opposing counsel talked in terms of pretext, implicating that this set of media regulations was enacted to prohibit inmates who participated in the Lucasville riots from media access. Well, first of all, at least when this motion for summary judgment was filed, there were 358 inmates in restricted population at OSP, the Ohio State Penitentiary. Only four of whom were present at Lucasville. The other 354 restricted population inmates were there like these four because they killed a guard, they repeatedly assaulted a guard, they tried to take over a prison, they were gang leaders, or they previously tried to escape. These are the most dangerous inmates in the entire prison system in the state of Ohio. All of whom are subject to the same, the very same media restrictions as are these four restricted population inmates. And that's what Judge Sargas said. Let me ask you this. Given the gravity of the competing arguments, why shouldn't Judge Sargas have let this case go to trial to examine more comprehensively the reason, the justification for the prison policies and also to look at the impact of the policies on the prison environment and the First Amendment right of the inmates? Why choke this case off at summary judgment and dispose of it at that point? Your Honor, that's a great question. First of all, I would invite the Court to look at the Netflix series, Captive, the Lucasville section. And it's cited in our brief at Record 32, page 213 and page 229. And if you look at that video, it has a range of viewpoints. Inmates who are at Lucasville, guards who are at Lucasville,  and you can see the impact that Lucasville itself had on the Lucasville population. Currently there are 48 inmates incarcerated at ODRC who are eligible for interviews, none of whom have been interviewed, but were at Lucasville. And there are 44 prison employees still employed by ODRC, again, who are present at Lucasville, none of whom were interviewed or have been interviewed by these appellants. Now, if you look at the Captive video on Netflix, what you'll see is a guard who was traumatized by the Lucasville riot, who talks in terms of the fact that he went back to work after 121 days, that he was not certain he could go without trying to seek revenge on these inmates, and yet he did it. He was able to go into the prison, and he was able to do his job professionally. Now, what our expert Professor Berman stated was the prospect of a recording of infamous Ohio prisoners discussing infamous rioting surely must send a chill down the spine of every prison official charged with keeping order inside a prison. That's at Dock 15, page 48. Under Turner, the third factor is the potential impact on prison guards and prison inmates. Presently at Ohio State Prisons, we have 44 guards and 48 inmates who were immediately impacted by Lucasville. They were there. And so to talk in terms of how should media access be given to these prisoners and all the prison has to concern itself with is what happens outside the prison, disregards these 48 inmates and these 44 guards who are still inside the prison who will also be impacted. And what we're looking at then is communication that would facilitate, enhance, and legitimize what happened at Lucasville. And if we buy into Mr. Vosvary's argument, then whether the other 354 inmates at OSP previously inside the prison, not outside the prison, but inside the prison, committed violent, disruptive, predatory, riotous acts or are serious threats to the prison itself because they've committed murder, they've taken hostages, they've repeatedly assaulted prisoners or guards, they've attempted escapes and they've attempted facility takeovers. So when you look at the case law, whether it's Thornburg or Hammer or this court's decision in Brown v. Johnson, you don't have to give the prisoners, restricted population prisoners, the opportunity to take over a prison or foment a riot or create a situation that just blows up. This is a closed environment containing the most dangerous inmates in all of Ohio. You don't have to wait for that to happen before you can take measures to stop it. In a prison official's professional judgment, the red line is drawn not at making direct phone calls, not at correspondence. The direct red line is drawn at in-person media access. Counsel, am I understanding correctly that under the rulings of the district judge, the prison still has in place the policy that the director or his designee has unfettered discretion to grant or deny any interview request with respect to the restricted prison population inmates, that that ability is still there? Well, with regards to the restricted population inmates, that policy is irrelevant because restricted population inmates get an interview anyway. So whether or not the prison officials have quote-unquote unfettered discretion is irrelevant because no restricted population inmate gets an interview and therefore that portion of the policy you're referring to never comes into play. So that the statement of policy that the director shall have discretion to grant or deny any interview request, that's irrelevant with regard to the restricted prison population because they never afforded the possibility of interviews under any circumstances. This is what I seem to be understanding you to be saying. That's correct, Your Honor. With regards to general population inmates, and inmate skates is in general population, it does come into play. But it does come into play not for Mr. Skates. It comes into play for the media representatives. So in other words, there's no content regulation here whatsoever. What the prison retains discretion for is to look to make sure that these are media representatives, that they have authentic credentials, they look at the credentials, there's a definition in the policy for credentials, there's a definition in the policy for media representation, and the... Well, on the face of the policy, there's no problem. But if the policy authorizes unfettered discretion, then if the director takes into account the content of the proposed interview or content-based considerations, how is that to be guided against? Well, factually, it's not unfettered discretion. That's both factually and actually legally unsupported, that claim. First, there's nothing about the restriction that restricts prison administrators, that allows prison administrators to have unfettered discretion to limit First Amendment rights. They're bound by the Constitution to limit restrictions on First Amendment rights to those that are reasonably related to legitimate penological objectives. And that's set forth in Turner. It's set forth in Thornburg. It's set forth in all of the case law that the appellants have cited. So first of all, it's bound, it's limited by constitutional requirements. And secondly, the Supreme Court, again in these very same cases, be it Turner or Thornburg, has held that the evaluation of penological objectives is committed to the considered judgment of prison administrators who are charged with and trained in the running of the particular institution. And so without that discretion, the prison would have no ability to stop a quote-unquote media representative from coming into the facility if he previously tried to extort a prisoner or tried to pay a prisoner for an interview or tried to use forged materials or do something in code or ferret out messages or facilitate an escape or had a sexual relationship with one of the prisoners. This policy is used to protect and maintain the security of the prison against attack, interference, sabotage, or to prevent, mitigate, or respond to acts of terrorism. It's not unfettered discretion. It's bound both by case law, by the Constitution, and by the prison officials' professional judgment. Do you have any cross appeals pending on appeal with regard to any of the district court's rulings? No. No, we're in full accord with those, Your Honor. All right. Now, Mr. Vasbari addressed the issue of mootness. And alleged that ODRC did not have sufficient evidence on the record to carry the heavy burden it needs to show with regards to whether or not the case is moot. He talked about the fact that the nature of the interview and victims' issues that could or would present a concern were eliminated from the policy. He then said that the policy was changed twice before it was ultimately enacted. Well, in the brief, the court will see the procedure by which a policy was changed, that in 2013, ODRC began its policy changes with regards to security, that media policies took a back seat until the security policies were solidified, that in March of 2017, ODRC turned its attention to the media policies, that there were meetings in March, April, May, June, July, regarding the media policies before they were ultimately enacted, that there were provisional policies that were floated, and they were floated for stakeholders to make comments on. Now, with regards to the changes to the media policies, ODRC determined that it didn't need victim impact with regards to restrictive population because those population inmates aren't going to have an interview anyway. Same thing with nature of the interview. Nature of the interview is irrelevant for restrictive population inmates because those inmates were precluded from media access. With regards to general population inmates, ODRC considered the suggestions made by Judge Sargas, took those into account, took stakeholders' comments into account, and determined that general population inmates do not pose the same inherent security risks as do restrictive population inmates. For that reason, they decided they could eliminate the nature of the interview, which, by the way, had never been used by ODRC officials to restrict media access to any of the appellants. But they could eliminate nature of the interview, and they could eliminate the concern for victims' issues because security and safety was not at such a high level with regards to general population. But what they did do is they added another paragraph with regards to the media policies regarding general population. And what they said... You may want to wind up fairly soon. Your real light's been on for a while. May I finish this one point? Sure. Go ahead. Thank you. And what that policy says is that if you are in general population and would be in restrictive population, but for the fact that you have a mental health status that precludes incarceration in restrictive population, you're still not entitled to media access. If there are no more questions, my time is up. Thank you, Your Honors. Thank you very much. I have five points on rebuttal. I'll try to move through them quickly. The first is let's dispel with this fiction that content neutrality is not required of these policies. If you look at Thornburg... What policies are you referring to? Policies which restrict the access of the media to prisons and the access of inmates to members of the media. Those policies are governed by Thornburg. And at 490 U.S., page 415, the court specifically says must be justified without regard to content. That's absolutely unambiguous. Now, let's talk about the unfettered discretion for a minute because we hear about terrorism and sexual relations and paying for interviews and the introduction of contraband, a whole parade of horribles that might happen and justify the survival of this catch-all provision. And then, Ms. Worley tells us, these policies aren't unfettered. They're cabined by the laws in the Constitution. I submit to the court that every policy of every sort that has ever been invalidated by a federal court because it violated the First Amendment was also so cabined. But it was only brought to book when it was brought to the courts. Counsel, you don't convince me more by raising your voice. I'm sorry, Judge, I just... Well, whatever, but I can tell you it doesn't. It's a turn-off. Well, as quietly as I can, then, every such policy. The laundry list isn't in there. There's nothing in that list that cabins the discretion of the official from putting anything into that category of other that they please. If it's going to be fettered discretion, the fettering has to happen within the bounds of the policy. Of course they're fettered by the Constitution, but that judgment needs to be made first and made incumbent upon the licensing or deciding official. That doesn't happen here. Now, they tell us that one of the prongs of Turner is that we have to consider the degree to which this impacts prison staff, and I agree. But another prong of Turner is the availability of readily and easily implemented alternatives. If the concern is that these statements and this incitement is going to find its way back into the prisons, note that they already have a system in place for screening as contraband any such materials and that they control access through the mails and through any electronic means of all media coming into the prison. So in order to prevent this stuff from getting into the prison, all they have to do is enforce the rules that they already have rather than throttle the creation and the dissemination into the public square of every face-to-face and recorded interview with an inmate. And by the way, a correction here, because however hundreds of many inmates were involved in Lucasville, let's be clear from the complaint until the reply brief in this case, we're discussing inmates convicted. Your Honor, may I finish this point? Inmates convicted of crimes in connection with the Lucasville riot, which rounds us to the last bit directly related to that, which is that if you look at that Netflix documentary that I talked about with the guards and the people and all of those others, two things stand out. One, you won't find anybody of that class in there because that viewpoint isn't permitted. And secondly, to the extent that they say OSP prisoners are in there, all OSP prisoners are on high security. Why were they permitted? Thank you very much, and the case is submitted.